**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY CORRAL,<br>c/o Friedman Nemecek Long & Grant,<br>L.L.C.<br>1360 E. 9th Street, Suite 650<br>Cleveland, Ohio 44114 | )<br>)<br>)<br>)<br>)<br>) | Case No: 1:24-cv-01559<br><br>JUDGE CHRISTOPHER A. BOYKO |
| Plaintiff, | )<br>)<br>) | **PLAINTIFF'S EMERGENCY**<br>**MOTION FOR TEMPORARY**<br>**RESTRAINING ORDER AND**<br>**PRELIMINARY INJUNCTION** |
| vs. | )<br>) | **(ORAL HEARING REQUESTED)** |
| CUYAHOGA COUNTY<br>2079 E. 9th Street<br>Cleveland, Ohio 44115 | )<br>)<br>) | |
| and | )<br>) | |
| CUYAHOGA COUNTY PROSECUTOR'S<br>OFFICE,<br>1200 Ontario Street. 9th Floor<br>Cleveland, Ohio 44113 | )<br>)<br>)<br>)<br>) | |
| and | )<br>) | |
| ROBERT DeSIMONE, Individually and<br>in his capacity as agent of<br>Cuyahoga County Prosecutor's Office<br>1200 Ontario Street. 9th Floor<br>Cleveland, Ohio 44113 | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

Now comes Plaintiff, Kimberly Corral, by and through undersigned counsel, Friedman

Nemecek Long & Grant, L.L.C., and pursuant to Civ.R. 65(A), hereby respectfully moves this

Honorable Court to issue a temporary restraining order and preliminary injunction pending a ruling

on Plaintiff's Complaint for Injunctive Relief, including Plaintiff's request for a permanent

injunction. More specifically, Plaintiff requests that this Honorable Court issue an Order

prohibiting the Cuyahoga County ("Defendant Cuyahoga County"), Cuyahoga County Prosecutor's Office ("Defendant Prosecutor's Office"), or any agent thereof, including, but not limited to, Robert DeSimone ("Defendant DeSimone") from requesting, serving, or seeking the enforcement of any previously issued subpoenas *duces tecum* which seek the production of items subject to attorney-client privilege, and/or from reviewing any materials, communications or other items that have already been produced pursuant to said subpoena.

The undersigned certifies to this Court that counsel has contacted Defendants and discussed the imminent filing of this action and has provided a copy of the pleadings, via email, prior to filing the same. This Court should not delay the issuance of the temporary restraining order because, upon information and belief, there is presently a pending subpoena *duces tecum* served upon ViaPath by Defendant which ostensibly seeks the production of recorded conversations between Plaintiff and her clients or prospective clients which are subject to attorney client privilege.

This filing is being submitted contemporaneously with Plaintiff's Verified Complaint for Injunctive and Other Relief, which alleges violations of the Fifth and Six Amendments by Defendant DeSimone and seeks relief pursuant to 42 U.S.C. §§ 1983 and 1988. (ECF Doc. #1) This action also seeks injunctive relief based upon the foregoing violations. The averments set forth in Plaintiff's Verified Complaint are incorporated herein by express reference.

At this juncture, Plaintiff is unaware of whether the relevant subpoena(s) have been or are in the process of being complied with, or the exact materials which are sought. Given the emergency nature of this action, Plaintiff respectfully requests a hearing on the same as soon as possible as to maintain the status quo and prevent the dissemination of potentially privileged materials without judicial oversight.

2

Reasons for the instant request are more fully stated in the accompanying Memorandum in Support, which is attached hereto and incorporated herein by reference.

Respectfully Submitted,

/s/ *Eric C. Nemecek*

ERIC C. NEMECEK (0083195)
IAN N. FRIEDMAN (0068630)
ERIC F. LONG (0093197)
MADELYN J. GRANT (0098165)
TYLER J. WALCHANOWICZ (0100115)
Counsel for Kimberly Corral
Friedman Nemecek Long & Grant, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, Ohio 44114
P: (216) 928-7700
F: (216) 820-4659
E: ecn@fanlegal.com

## **MEMORANDUM IN SUPPORT**

### I.    **RELEVANT FACTS**

Plaintiff is an attorney who is licensed in the State of Ohio. She is engaged in the practice of criminal defense, including representing clients in post-conviction proceedings.

On or about August 7, 2024, the City of Cleveland, relative to a civil lawsuit in which the City was a named Defendant[1], issued a subpoena (hereinafter referred to as the "federal subpoena") to Global Tel*Link Corporation[2] ("GTL") seeking "Call recordings for all calls placed by any inmate of the Ohio Department of Rehabilitation and Correction" ("ODRC") to four (4) different phone numbers from January 1, 2012, to the present. (*Plaintiff's Exhibit A*, *attached hereto*). All

---

[1] *Sailor, et al., v. City of Cleveland, et al.*, U.S. District Court for the Northern District of Ohio Case No.: 1:20-cv-00660.
[2] Global Tel*Link Corporation has rebranded into ViaPath Technologies. Hereinafter, the entity will be referred to as "GTL/Viapath."

but one (1) of the phone numbers listed belonged to Plaintiff and/or Plaintiff's law firm. Upon learning that the City of Cleveland had issued the above-referenced subpoena, Plaintiff immediately retained counsel and sought leave of Court to intervene in the matter in order to assert the attorney-client privilege with respect to any and all communications with clients or prospective clients of Plaintiff that may have been encompassed within the subpoena *duces tecum*.

On August 22, 2024, Plaintiff voluntarily withdrew her Motion to Intervene in the suit following the City of Cleveland agreeing to withdraw the offending subpoena. The City of Cleveland further agreed that they would inform the undersigned should any further subpoena be issued seeking potentially privileged information related to Plaintiff.

After the subpoena was withdrawn, undersigned Counsel requested that GTL/ViaPath inform them should a subsequent subpoena be re-issued seeking the same information related to Plaintiff or her law firm. On or about August 29, 2024, the undersigned was informed via email by a representative of GTL/ViaPath that the company had received an additional subpoena *duces tecum* seeking the same information as the federal subpoena.[3] (*Plaintiff's Exhibit B, attached hereto*) After confirming that the subpoena had been issued by the named Defendants, counsel advised GTL/ViaPath of its intention to seek judicial intervention in light of the privileged nature of the communications.  Counsel asked GTL/ViaPath to withhold producing any materials in response to the subpoena duces tecum until the privilege issues could be addressed by a court of proper jurisdiction.

---

[3] Neither Plaintiff nor the undersigned possess and or have reviewed the contents of the subsequent subpoena. As such, Plaintiff must speculate as to what materials are sought. However, as discussed *infra*, there is a substantial likelihood that the communications which are sought by the subpoena are subject to attorney-client privilege.

Thereafter, the undersigned made multiple attempts to discuss the subpoena and attendant privilege issues with Defendant DeSimone as well as other representatives of Defendant Prosecutor's Office. As of the date of this filing, no fruitful conversation has transpired.

## II.    LAW AND ARGUMENT

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)). Given this limited purpose, and in light of the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal - and evidence that is less complete - than in a trial on the merits. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). Accordingly, the Plaintiff "is not required to prove his case in full at a preliminary injunction hearing." *Id*.

In the Sixth Circuit, courts must engage in a four-factor analysis to decide whether to grant a preliminary injunction. *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017); *Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015). These four factors include:

> (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether he would suffer irreparable injury without the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether issuing the injunction would serve the public interest.

*Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). See also *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).

These factors are to be considered and balanced. They are not prerequisites that must be met. *See S. Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017); *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017).

### A. Plaintiff Has a Strong Likelihood of Success on the Merits

    **i.**    **The Subpoena Ostensibly Requests Communications that are Subject to Attorney-Client Privilege and are Therefore Protected from Disclosure**

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law," and its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). It is a privilege "rooted in the imperative need for confidence and trust," *Trammel v. United States*, 445 U.S. 40, 51 (1980), which for centuries has been understood to require that the client believes in the attorney's ability to preserve the client's confidences. *See* 8 Wigmore, Evidence (McNaughton Rev. 1961), § 2290 (privilege already well-established in reign of Elizabeth I). It "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Upjohn*, 449 U.S. at 389. The privilege therefore "rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out." *Id*, *quoting Trammel*, 445 U.S. at 51. Such "assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888). So robust is the privilege, and so important is a client's faith that confidences will be maintained, that the privilege survives even the client's death. *See Swidler & Berlin v. United States*, 524 U.S. 399, 407-411 (1998).

Thus, even when protecting the attorney-client privilege results in some loss of evidence being available for use in investigations or judicial proceedings, courts have justified this loss "in part by the fact that without the privilege, the client may not have made such communications in the first place." *Swidler & Berlin*, 524 U.S. at 408. "This unspoken 'evidence' will therefore serve no greater truth-seeking function than if it had been spoken and privileged." *Jaffee v. Redmond*, 518 U.S. 1, 12 (1996).

The federal subpoena issued in the civil matter sought all recorded telephone calls in GTL/ViaPath's possession between inmates who are incarcerated at various prison facilities and Plaintiff or other employees of her firm beginning in 2012 and continuing to the present day. As discussed *supra*, Plaintiff nor undersigned counsel possess a copy of the subsequent subpoena at issue or have viewed its contents. However, upon information and belief, the subpoena requests production of some presently unknown portion of the same materials sought by the federal subpoena, which itself requested an expansive swath of privileged communications. As such, there is ample reason to assume that the communications requested in the subpoena are likewise confidential and privileged and therefore not subject to disclosure through a subpoena *duces tecum*. *See* Fed. R. Civ. P. 45(d)(3)(A)(iii)-(iv).

Specifically, the recordings would depict (1) communications between clients – or prospective clients –and counsel, which (2) were intended to be and were in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice and/or representation. *See, e.g., State ex rel. Leslie v. Ohio House Fin. Agency, 2005-Ohio-1508, ¶21 (Ohio 2005) (*noting that in Ohio, "(1) [w]here legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by

the legal adviser, (8) unless the protection is waived").

> **ii.    The Determination of Whether – or to What Extent – the Communications are Subject to Attorney-Client Privilege Must be Resolved by the Court.**

Several courts, including the Sixth Circuit, have recognized that when a dispute arises as to whether a lawyer's communications or a lawyer's documents are protected by the attorney-client privilege, the resolution of that dispute is a judicial function. *See, e.g., NLRB v. Detroit Newspaper*, 185 F.3d 602, 606 (6th Cir. 1999) (concluding that "district court had the obligation…to determine whether the subpoenaed documents were protected by some privilege, and had no discretion to delegate that duty"); *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 498-500 (4th Cir. 2011) (concluding that, in deciding whether to enforce an administrative subpoena seeking potentially privileged documents, a court "cannot delegate" an *in camera* review of documents to an agency, but must itself decide a claim of privilege); *In re the city of New York*, 607 F.3d 923, 947 (2nd Cir. 2010) (observing that evaluation privilege claim is always a judicial function); *In re Grand Jury Proceedings #5 Empanelled Jan. 28, 2004*, 401 F.3d 247, 256 (4th Cir. 2005) (remanding to district court for *in camera* review concerning privileged communications and applicability of crime-fraud exception).  Indeed, the Constitution vests "[t]he judicial Power" solely in the federal courts, *see* U.S. Const. art. III, § 1, which includes "the duty of interpreting and applying" the law, *see Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923).

Accordingly, courts have traditionally rejected procedures or protocols that abdicate the judge's authority and responsibility to determine whether materials are subject to attorney-client privilege and, therefore, protected from disclosure. *See, e.g., In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) (granting injunction prohibiting Government from utilizing a taint team to review materials seized from a law firm pursuant to a search warrant); *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 962 (3rd Cir. 1984) (rejecting Government's

proposed use of taint team and instead suggesting that court appoint a special master to conduct document review); *United States v. Stewart*, 2002 WL 1300059, *7 (S.D.N.Y. June 11, 2002) (approving appointment of special master to review documents seized from criminal defense attorney and determine whether the materials were subject to attorney-client privilege); *United States v. Abbell*, 914 F. Supp. 519, 519-520 (S.D. Fla. 1995) (ordering review by special master in case involving "a complex underlying investigation that alleges crimes of narcotics trafficking, money laundering and obstruction of justice," and enjoining "taint team" from disclosing any seized documents to the prosecuting team pending the special master's review); *United States v. Neill*, 952 F. Supp. 834, 841 n. 14 (D.D.C. 1997) (calling Government's use of "taint team" both "troubling" and "unwise" and noting that "at the very least" it creates an "appearance of unfairness").

Pertinent guidance can be drawn from cases involving the Government's seizure of materials from – or related to – law firms, usually by way of a search warrant. For instance, in *Krut*, *supra*, the Third Circuit protected the attorney-client privilege and work-product doctrine in the face of a "government rampage" that "potentially or actually invaded the privacy of every client of the…firm." *Krut*, 744 F.2d at 962. Only one (1) lawyer and one (1) firm employee were targets of the Government's investigation, which concerned only one (1) aspect of that lawyer's practice (*i.e.*, alleged fraudulent inflation of medical bills in personal injury cases). Despite the seemingly limited investigative scope, the Government obtained warrants permitting the search of all client files to determine which personal injury case files to seize, and to seize virtually all of the firm's business records. *Id*. at 960.

The Third Circuit took special note of the risks a law firm search poses to the rights and privileged materials of third parties who are not related to the Government's investigation,

including both other clients and other lawyers of the firm. *Id*. at 960-962.  The court chastised the Government for engaging in a "rampant trampling of the attorney-client privilege," *see id*. at 961-962, and disregarding not only the ancient principles on which the privilege is based, but also "the cannons of ethics mak[ing] the attorney's common law obligation to maintain the secrecy of his communications with his client a professional mandate." *Id*. at 960-961.  Accordingly, the Third Circuit affirmed the district court's issuance of a preliminary injunction and order requiring the Government to return the law firm's files.  The Third Circuit further directed the district court to institute a procedure on remand that "should accommodate the needs of the investigating authorities and at the same time protect the significant interests of [firm] clients who have no connection with the subject of the investigation." *Id*. at 962.

The district court's decision in *Stewart*, *supra*, is also instructive.  Therein, the Government seized files from a criminal defense attorney accused of conspiring with a known terrorist. *See Stewart*, 2002 WL 1300059 at *1.  The documents seized included those relating to the attorney's representation of the terrorist, but also those concerning her representation of other criminal defense clients, and clients of other attorneys who shared office space with her.  The district court concluded that a special master should review documents seized from a criminal defense practitioner because the documents included privileged communications with clients unrelated to the investigation for whom no showing of probable cause had been made. *Id*. at *7.  As the court explained:

> this case is exceptional in that the documents seized on April 9, 2002 are likely to contain privileged materials relating not only to unrelated criminal defendants but also to the clients of attorneys other than the defendant, for whom there has been no showing of probable cause of criminal conduct.  The privilege and responsiveness concerns raised by this class of materials are therefore exceptional, and the likely existence of materials that fall into this class speaks in favor of appointment of a Special Master.

10

*Id.*

Similarly, a district court in Arizona recently followed *Stewart*, *supra*, and appointed a special master to review files seized from a law firm under suspicion that an attorney had assisted one of his clients in the commission of a crime. *See United States v. Gallego*, 2018 WL 42579967 (D. Ariz. Sept. 6, 2018). As the Government acknowledged, its seizure encompassed files that "likely contain privileged material pertaining to unrelated clients of" the target attorney. *Id.* at *3. The court recognized that the Government's "taint team" proposal threatened to invade the clients' Sixth Amendment rights to effective assistance of counsel and a fair trial, which militated in favor of appointing a special master. *Id.*

Courts throughout Ohio have consistently held that the most appropriate way to determine whether a privilege applies to materials sought in discovery is for the trial court to conduct an *in camera* inspection. *See, e.g., State ex rel. Fisher v. PRC Pub. Sector, Inc.*, 99 Ohio App.3d 387, 383 (Ohio App. 10th Dist. 1994); *Chasteen v. Stone Transport, Inc.*, 2010-Ohio-1701, ¶25 (Ohio App. 6th Dist. 2010) ("Many Ohio appellate courts approve of an *in camera* inspection of records when there is a factual dispute over the scope of discovery").

Unlike the foregoing cases, Defendants, upon information and belief, have not even suggested the utilization of a taint or filter team, nor have they proposed any procedures or protocols by which they intend to review the recorded communications to determine issues of privilege and/or relevance. Instead, it appears that Defendants have unilaterally determined, without having actually reviewed any of the conversations, that none of the ostensibly subpoenaed communications are subject to attorney-client privilege.[4] Thus, absent intervention from this

---

[4] This conclusion was also reached despite the fact that Plaintiff would ostensibly be a party to all of the communications at which the subpoena is directed.

Honorable Court, there would be absolutely no mechanisms in place to prevent the disclosure of communications that are subject to attorney-client privilege.

### iii. The Subpoena Ostensibly Violates Defendants' Own Established Policy for Listening to Recorded Conversations Between Defense Counsel and Jailed Defendants

Effective May 6, 2024, the Cuyahoga County Prosecutor's Office implemented a policy relative to Assistant Prosecuting Attorneys ("APAs") and Investigators listening to recorded jail calls between incarcerated defendants and their counsel of record. (*Plaintiff's Exhibit C, attached hereto*). The policy mandates that APAs and Investigators obtain the name of the attorney(s) representing jailed defendants, refrain from reviewing communications made by or to a defendant if their attorney is the recipient or sender, cease listening to a communication involving a jailed defendant if their attorney subsequently becomes a party to the conversation, and document and report any instance in which these directives were inadvertently violated. Notably, this policy was put in place despite the fact all parties to these communications are given advance notice that they are being recorded.

The policy further outlines an exception to its general prohibition on reviewing attorney-client conversations which allows APAs and investigators to review these calls after obtaining supervisory approval to do the same when there is evidence that defense counsel may be involved in criminal activity or is complicit in the jailed defendant's criminal activity.

At the time of this filing, Plaintiff is aware of no information which tends to show that the prerequisites have been met in order for Defendant DeSimone, or any other agent of Defendant Prosecutor's Office, to contravene the general policy adopted by the Cuyahoga County Prosecutor's Office that attorney-client jail calls should not be reviewed. As such, the enforcement

of the subpoena violates Defendant's own policy, in addition to the sacred right of attorney client privilege.

**B. Absent an Injunction, Plaintiff and her Clients or Prospective Clients will Suffer Irreparable Harm.**

Plaintiff, as well as her clients and prospective clients undoubtedly face "irreparable harm" should the Court not enjoin Defendant from seeking enforcement of the subpoena or serving any other subpoena seeking privileged communications. Again, said communications clearly fall within the ambit of attorney-client privilege. Once these communications are disclosed, the status quo can never be adequately restored. As one court has recognized:

> [o]nce confidentiality is breached, the harm is done and cannot be undone. Plaintiff cannot subsequently perform its commitment to its clients to protect the confidentiality of the documents and the information which they contain. There is no way to recapture and remove from the knowledge of others information improperly disclosed by Defendant. No court order or specific performance can be framed to accomplish that end, and no award of money damages will change the fact that information which Plaintiff was entitled to have kept from the knowledge of third parties is no longer shielded from their gaze. Confidentiality, like pregnancy, is an all or nothing proposition; either it exists or it does not exist.

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 72 (D. Me. 1993).

In other words, once the communications are surrendered, "confidentiality will be lost for all time. The status quo could never be restored." *Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979); *see also PepsiCo, Inc. v. Redmond*, 1996 WL 3965, *30 (N.D. Ill. 1996) ("just as it is impossible to un-ring a bell, once disclosed,…confidential information lose their secrecy forever"); *Metro. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 172 (D.D.C. 1976) ("Once disclosed, such information would lose its confidentiality forever").

In the matter *sub judice*, Plaintiff and her clients stand to suffer real and irreparable harm should Defendant obtain and review the recorded communications that ostensibly are the subject

13

of the subpoena *duces tecum*.  Disclosing the conversations would completely eviscerate any confidentiality or protection that the law recognizes with respect to said conversations.  For Plaintiff's clients or prospective clients, disclosure would also compromise/unfairly infringe upon their constitutional rights under the Fifth and Sixth Amendments to the United States Constitution, which is itself sufficient to warrant relief. *See, e.g., Beattie v. Line Mountain Sch. Dist.*, 992 F. Supp. 2d 384, 396 (M.D. Pa. 2014) ("Deprivation of a constitutional right alone constitutes irreparable harm as a matter of law, and no further showing of irreparable harm is necessary"); *Musser's Inc. v. U.S.*, 2011 WL 4467784, *8 (E.D. Pa. Sept. 26, 2011) (noting that "[d]eprivation of a constitutional right has been recognized as irreparable harm").

This is particularly true when considering that Plaintiff is opposing counsel to the Defendant Prosecutor's Office on a regular basis.  This includes clients who are involved – or may become involved – in litigation against Defendants in unrelated proceedings.  At the very least, Defendants' possession and review of the subpoenaed materials gives rise to an appearance and risk of impropriety that undermines the attorney-client relationship as well as the public's confidence in the same.

**C. An Injunction Would Not Cause Substantial Harm to Others**

The only harm that may come from this matter would be caused by Defendants' attempts to compel GTL/ViaPath to turn over an indeterminate, perhaps sweeping, amount of confidential communications between an attorney and her clients or potential clients. If an injunction is granted, the status quo will be maintained, and these privileged communications will remain free of outside infiltration. Moreover, as discussed *supra*, courts have justified the potential loss of evidence which may result from the protection of attorney-client privilege. *See Swidler & Berlin*, 524 U.S. at 408.  As such, an injunction would not cause substantial harm to others.

14

***D. An Injunction Would Be in the Public's Interest***

The Sixth Amendment right to effective assistance of counsel includes the ability to speak candidly and confidentially with counsel free from unreasonable government interference. *See Weatherford v. Bursey*, 429 U.S. 545, 554 n. 4 (1977) ("One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard"). "Implicit within the meaning of Section 10, Article I, and the analogous protections of Section 16, Article I, is the right of a criminal defendant to consult privately with his attorney." *State v. Milligan*, 40 Ohio St.3d 341, 342 (Ohio 1988). "[E]vidence obtained through the unauthorized interception of a private conversation between a criminal defendant and his attorney is subject to suppression pursuant to Section 10, Article I of the Ohio Constitution." *Id*.

The attorney-client privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt*, 128 U.S. at 470. The "cornerstone" of the attorney-client relationship is confidentiality. *See* Gregory C. Sisk, *Legal Ethics and the Practice of Law 4-6.1*, LEGAL ETHICS, PROF. RESP., & THE LEGAL PROF. (2018), at 305. Confidentiality is necessary to build a trusting relationship between attorney and client, and to help ensure the attorney obtains all information necessary to represent appropriately the client's interests.  Indeed, lawyers have an ethical duty to ensure that communications with a client are confidential. *See* Ohio Rules of Prof'l Conduct, R. 1.6(c) (2021).  A policy that intrudes upon the attorney-client privilege and the confidential nature of those communications makes it impossible

for an attorney to comply with her obligations, interferes with the client's right of free speech and access to the courts, and disrupts the entire legal process.

There is a strong public interest in protecting the attorney-client privilege and the confidentiality of attorney-client communications. *See Krut*, 744 F.2d at 960 ("Documents within the scope of the attorney-client privilege are 'zealously protected' . . . the attorney-client privilege is so sacred and so compellingly important . . . the canons of ethics make the attorney's common law obligation to maintain the secrecy of his communications with his client a professional mandate.") (internal citations omitted); *Martin v. Lauer*, 686 F.2d 24, 32–33 (D.C. Cir. 1982) ("Through the attorney-client privilege, the common law 'encourage(s) full and frank discussions between attorneys and their clients and thereby promote(s) broader public interests in the observance of law and the administration of justice.  The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends on the lawyer being fully informed by the client'").

The enduring importance of the privilege within our constitutional order cannot be denied, and this alone places relief squarely within the public interest. *See, e.g.*, *Upjohn*, 449 U.S. at 389; *Swidler*, 524 U.S. at 403.  It "too often is overlooked that the lawyer and law office are indispensable parts of our administration of justice." *Hickman*, 329 U.S. at 514-515 (Jackson, J., concurring).  "Law-abiding people can go nowhere else to learn the ever changing and constantly multiplying rules by which they must behave and to obtain redress for their wrongs.  The welfare and tone of the legal profession is therefore of prime consequence to society." *Id*. at 515.

Admittedly, a person in pretrial or post-conviction confinement does not have the same expectation of privacy as the rest of the public.  He or she does, however, have a Sixth and Fifth Amendment right to confer with an attorney in private, to not have those conversations overheard,

16

and to have an attorney seek to protect that right. *See, e.g., Turner v. Safley*, 482 U.S. 78, 84 (1987) ("[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates…Prison walls do not form a barrier separating prison inmates from the protections of the Constitution"); *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this country").

Rather, both incarcerated individuals and those with whom they correspond, including their attorneys, have a First Amendment right to confidential legal communications. "Access is essential to lawyers and legal assistants representing prisoner clients, to journalists seeking information about prison conditions, and to families and friends of prisoners who seek to sustain relationships with [prisoners]." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). And, "[i]n the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights." *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 884 (3rd Cir. 1997).

What's more, granting the Defendant unfettered access to review the communications in this case would deservedly draw public scrutiny and undermine confidence in the judicial system. This is especially true when considering that Defendants would potentially gain access to the recorded communications of Plaintiff's clients or prospective clients who are, have been, or could be investigated and prosecuted by Defendants. It would be difficult for reasonable members of the public to believe that these individuals would disregard information in Plaintiff's conversations that might be relevant to other criminal or civil matters within their jurisdiction.

Respectfully, allowing Government agents to review recorded communications that are protected by attorney-client privilege is at odds with the fundamental concepts of due process and fairness, the right to effective assistance of counsel, as well as the appearance of justice. *See, e.g.,*

U.S. Const. Amen. VI; *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (granting injunction prohibiting Government from utilizing a taint team to review materials seized from a law firm pursuant to a search warrant); *In re Search Warrant for Law Offices Executed on Mar. 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994) ("It is a great leap of faith to expect that members of the general public would believe any ... wall [between a filter team and a prosecution team] would be impenetrable; this notwithstanding our own trust in the honor of an AUSA"); *In re Grand Jury Subpoenas*, 454 F.3d 511, 523 (6th Cir. 2006) (permitting the Government to review documents subpoenaed from a law firm would reasonably be perceived as the "fox [being]left in charge of the [Law Firm's] henhouse").

Accordingly, there is a compelling public interest in the Court granting an emergency temporary restraining order and preliminary injunction relative to Plaintiff's confidential communications.

### III.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff requests that this Honorable Court grant an emergency temporary restraining order and, following an oral hearing, a preliminary injunction prohibiting the Cuyahoga County Prosecutor's Office from seeking enforcement of – and/or reviewing any materials produced in response to – the subpoena *duces tecum* previously served upon GTL/ViaPath, as well as from issuing any further subpoenas which seek the production of conversations, documents, or other materials involving Plaintiff which are protected by attorney-client privilege. Plaintiff submits all four factors in determining whether injunctive relief should be granted have been met, and therefore, a preliminary injunction is warranted.

**WHEREFORE,** Plaintiff requests the issuance of a temporary restraining order that would comport with her requested relief, a hearing on her request for a preliminary injunction; and a preliminary and/or permanent injunction that protects the confidential communications between her and her clients from undue and injurious divulsion. Additionally, Plaintiff requests an order mandating that she receive a copy of the subject subpoena subject to any protective order the Court deems appropriate.

Respectfully Submitted,

/s/ *Eric C. Nemecek*

ERIC C. NEMECEK (0083195)
IAN N. FRIEDMAN (0068630)
ERIC F. LONG (0093197)
MADELYN J. GRANT (0098165)
TYLER J. WALCHANOWICZ (0100115)
Counsel for Kimberly Corral
Friedman Nemecek Long & Grant, L.L.C.
1360 East 9th Street, Suite 650
Cleveland, Ohio 44114
P: (216) 928-7700
F: (216) 820-4659
E: ecn@fanlegal.com